**METRO BANK, Appellant**

**v.**

**BOARD OF COMMISSIONERS OF MANHEIM TOWNSHIP,**
**Pennsylvania.**

Commonwealth Court of Pennsylvania.

Argued June 15, 2015.

Decided July 9, 2015.

Kathryn L. Simpson, Harrisburg, for appellant.

William C. Crosswell, Lancaster, for appellee Manheim Township Department of Planning and Zoning.

William C. McCarty, Lancaster, for appellees Township of Manheim and Board of Commissioners of Manheim Township.

BEFORE: ROBERT SIMPSON, Judge, P. KEVIN BROBSON, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Senior Judge JAMES GARDNER COLINS.

██ On June 10, 2013, the Board of Commissioners of Manheim Township, Lancaster, Pennsylvania (Board) denied the request of Metro Bank (Metro) to recalculate a transportation impact fee, as calculated by the Manheim Township Department of Planning and Zoning (Township) in the amount of $124,356.10. On July 16, 2014, the Court of Common Pleas of Lancaster County (Trial Court) upheld the Board's decision. Metro appealed to this Court for review, and, on October 8, 2014, the Trial Court filed a written opinion in support of its decision pursuant to Pa.R.A.P. 1925(a). For the reasons set forth below, we affirm.[1]

Metro intends to build a bank branch facility at 3199 Lititz Pike, located at the intersection of Lititz Pike and Airport Road in Manheim Township (Property). (Board Opinion, Finding of Fact (F.F.) ¶ 2, Reproduced Record (R.R.) at 275.) The Board's impact fee ordinance sets forth four transportation service areas with corresponding per-trip cost multipliers for calculating the transportation impact fee for a specific new development project. (Manheim Township Impact Fee Ordinance No. 1999–8 (Ordinance) Appendix B.1, R.R. at 273; see also Board Opinion, Conclusion of Law (C.L.) ¶ 9, R.R. at 280.) The Property is located in Transportation Service Area "B," where the per-trip cost multiplier used to calculate the transporta-

tion impact fee of new development is $1,130.51. (Board Opinion, F.F. ¶ 11, R.R. at 276; see also Ordinance Appendix B.I, R.R. at 273.)

The Township calculated the per-trip cost multiplier for Transportation Service Area "B" by dividing the "total cost of road improvements attributable to and necessitated by New Development" by the "anticipated peak hour trips generated by New Development consistent with adopted land use assumptions." (Ordinance Appendix B.I, R.R. at 273; see also Board Opinion, C.L. ¶ 9, R.R. at 280.) The Township calculates impact fees by multiplying the per-trip cost by the total number of peak-hour trips attributable to a new development project, which it determines in accordance with the Trip Generation Manual (Manual), published by the Institute of Transportation Engineers (ITE). (Ordinance Appendix B.II, R.R. at 274; see also Board Opinion, C.L. ¶ 11, R.R. at 280.) Total peak-hour trips count the combined number of trips entering and exiting the driveway(s) at the site of a specific new development project. (Board March 11, 2013 Hearing Transcript (H.T.) at 66, R.R. at 87.)

In October 2009, Herbert, Rowland, & Grubic, Inc. (HRG) submitted a traffic study to the Township on behalf of Metro, which indicated that the proposed bank branch facility would generate an estimated 110 total peak-hour trips, with a fifty-seven percent pass-by rate, for a total of forty-seven new peak-hour trips. (Board Opinion, F.F. ¶¶ 4–5, R.R. at 276.) New peak-hour trips subtract the amount of

---

[1]. Where, as here, the trial court takes no additional evidence, our scope of review in a zoning appeal is limited to a determination of whether the board committed an abuse of discretion or an error of law. *Valley View Civic Association v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637, 639 (1983).

An abuse of discretion is established where the findings are not supported by substantial evidence. *Id.* Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

pass-by trips, which is the amount of trips to and from a new development project's driveway by cars that would have been on the roadway notwithstanding the project, from the amount of total peak-hour trips. (H.T. at 8–12, R.R. at 29–33.) ITE also publishes a Trip Generation Handbook (Handbook), which provides recommendations as to the amount of pass-by trips that will occur at a new development project. (Board Opinion, F.F. ¶ 20, R.R. at 277; H.T. at 9–10, R.R. at 30–31.) In the study, HRG multiplied the smaller number of new peak-hour trips by the per-trip cost to calculate a total transportation impact fee of $53,133.97. (Board Opinion, F.F. ¶¶ 5, 16, R.R. at 276–77.)

Alternatively, the Township calculated the transportation impact fee as $124,356.10, based on its June 2010 determination that the proposed bank branch facility would generate an estimated 110 total peak-hour trips—inclusive of pass-by trips—multiplied by the per-trip cost of $1,130.51. (Board Opinion, F.F. ¶¶ 10–13, R.R at 276; *see also* Township Exhibit No. 2, R.R. at 164–247.) On December 7, 2012, Metro requested a public meeting to consider the Township's calculation of the transportation impact fee. (Board Opinion, F.F. ¶ 14, R.R. at 277.) On March 13, 2013, the Board conducted the public meeting, and Metro asserted that its method of calculating the transportation impact fee was supported by Article V–A (Act 209) of the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, No. 247, *added by* Act of December 19, 1990, P.L. 1343, No. 209, 53 P.S. §§ 10501–A–10508–A. (Board Opinion, F.F. ¶¶ 18–19, R.R. at 277.)

Following the public meeting, the Board confirmed and approved the Township's calculation of the transportation impact fee. (Board Opinion, Decision, R.R. at 281.) The Board noted that the only reference to pass-by trips in Act 209 occurs in Section 505–A(h) of the MPC, 53 P.S. § 10505–A(h), which provides for the assessment of an additional transportation impact fee on new development projects generating 1,000 or more new peak-hour trips, less pass-by trips. (Board Opinion, C.L. ¶ 13, R.R. at 281.) Since Metro's proposed bank branch facility would not generate 1,000 or more such trips, the Board concluded that Section 505–A(h) did not apply, and that pass-by trips were not to be excluded for purposes of calculating the transportation impact fee. (Board Opinion, C.L. ¶ 14, R.R. at 281.) Furthermore, the Board credited the testimony of the Township's expert witness, and concluded that the Township's calculation of the transportation impact fee complied with the Ordinance and Act 209. (Board Opinion, C.L. ¶ 15, R.R. at 281.)

The Trial Court affirmed the Board's decision. (Trial Court Opinion (Trial Ct. Op.) at 23, R.R. at 321.) The Trial Court found that the Township's calculation of the per-trip cost for Transportation Service Area "B," using the total number of vehicle trips as the divisor pursuant to the Ordinance, accorded with Section 505–A(a)(1). (Trial Ct. Op. at 18–20, R.R. at 316–18.) Likewise, the Trial Court found that the Township's calculation of the transportation impact fee for Metro's proposed bank branch facility, which multiplied the per-trip cost by the estimated number of peak-hour trips attributable to the project, accorded with both the Ordinance and Section 505–A(a)(2). (Trial Ct. Op. at 20, R.R. at 318.)

The Trial Court distinguished Section 505–A(a)(2), a section of Act 209 that does not mention the subtraction of pass-by trips in the calculation of transportation impact fees, from Section 505–A(h), the only section of Act 209 that does. (Trial Ct. Op. at 21, R.R. at 319.) Citing canons

of statutory construction, the Trial Court noted that "where the legislature includes specific language in one section of the statute and excludes it from another, the language should not be implied where excluded." (Trial Ct. Op. at 22–23 (internal citations omitted), R.R. at 320–21.) Thus, the Trial Court concluded that the inclusion of a reference to pass-by trips in Section 505–A(h), together with the exclusion of any reference to pass-by trips elsewhere in the statute, evinced a legislative intent to allow for the subtraction of pass-by trips only in a particular context that is not applicable to this dispute. (Trial Ct. Op. at 23, R.R. at 321.) Metro appealed to this Court for review.

Metro premises its argument on the difference between the language employed by Section 505–A(a)(1), which dictates that the divisor used to determine the per-trip cost multiplier be calculated in accordance with the Manual, and Section 505–A(a)(2), which dictates that the factor used to determine the transportation impact fee for a specific new development project, in conjunction with the per-trip cost multiplier, be derived using generally accepted traffic engineering standards. Metro argues that the difference in language between the two sections denotes a legislative intent to differentiate between the methods of computing the amount of trips used to calculate a per-trip cost multiplier and a specific transportation impact fee for a new development project. Metro argues that strict reliance on only the Manual would render the requirement that generally accepted traffic engineering standards be used to estimate the number of peak hour trips irrelevant.

Metro acknowledges that the Manual does not mention the concept of pass-by trips, and that there are no references to the Handbook, which does mention the concept of pass-by trips, in either the Ordinance or Act 209. However, Metro points to the testimony of its expert witness to conclude that reference to both the Manual and the Handbook is the generally accepted traffic engineering standard in calculating the amount of traffic to be generated by new development. Furthermore, Metro supports this position by emphasizing that a project qualifying as new development is expected to generate additional vehicular traffic, which it concludes to be only traffic present on the roadway because of the new development. Finally, Metro argues that the Board committed an error of law when it confirmed and approved the Township's calculation of the transportation impact fee, and that the Trial Court committed an error of law and abused its discretion by affirming the Board's decision.

The Township distinguishes pass-through traffic, defined in Section 502–A of the MPC, 53 P.S. § 10502–A and appearing elsewhere in Act 209, from pass-by trips, not defined in Section 502–A and appearing only in Section 505–A(h). The Township maintains that the absence of language pertaining to pass-by trips in Section 502–A(a)(2) evidences a clear legislative intent to allow for the inclusion of pass-by trips when calculating the impact fee for new developments unless they are subject to Section 505–A(h). Furthermore, the Township argues that Metro's calculation of the transportation impact fee is mathematically illogical, and that Section 505–A(a)(1) and Section 505–A(a)(2) must be read together. The Township's expert testimony indicated that the Township previously calculated the per-trip cost multiplier for Transportation Service Area "B" using total trips as a divisor. As such, the Township argues, the calculation of the transportation impact fee for a specific new development project must also use total trips; otherwise, the mathematical formula would not make sense, would re-

sult in an unbalanced equation, and would promote an absurd result.

The Township also presents an alternative to Metro's conclusion as to the difference in language between Section 505–A(a)(1) and Section 505–A(a)(2). The Township argues that the broader language used in Section 505–A(a)(2) is necessary because no publication by a national entity such as ITE can forecast trip generation for every possible use and every iteration of a use, so engineering judgment may be necessary for a given new development.

■ The issue before this Court is primarily one of statutory construction. The purpose of statutory interpretation is "to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). If the statute is ambiguous, then a court may consider other matters to ascertain the legislative intent. 1 Pa. C.S. § 1921(c). There is a presumption that the "General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S. § 1922(1). "Where ... the legislature includes specific language in one section of a statute and excludes it· from another, it should not be implied where excluded." *West Penn Allegheny Health System v. Medical Care Availability & Reduction of Error Fund,* 11 A.3d 598, 606 (Pa.Cmwlth. 2010), *aff'd,* 611 Pa. 200, 23 A.3d 1052 (2011) (internal citations omitted).

The General Assembly passed Act 209 as a response to the increased difficulty municipalities faced "in developing revenue sources to fund new capital infrastructure...." Section 501–A of the MPC, 53 P.S. § 10501–A. As such, Act 209 permits governing bodies of municipalities to enact ordinances imposing impact fees as a condition precedent to municipal approval of any new development project in order to generate revenue for funding the costs of transportation capital improvements, i.e., "offsite [road] improvements ... that serve the needs of more than one development," necessitated by and attributable to the new development project. 53 P.S. § 10502–A; 503–A(a) of the MPC, 53 P.S. § 10503–A(a). "New development" is defined "as any ... project which involves new construction ... and which is expected to generate additional vehicular traffic within the transportation service area of the municipality." 53 P.S. § 10502–A.

Before the enactment of any impact fee ordinance, a municipality must adopt a transportation capital improvements plan that identifies the projects to be included in the plan, and delineates the transportation service area(s) where the total development potential creates the need for transportation capital improvements. 53 P.S. § 10502–A; Section 504–A of the MPC, 53 P.S. § 10504–A. A "transportation service area" is defined as "a geographically defined portion of the municipality ... which ... has an aggregation of sites with development potential creating the need for transportation improvements within such area to be funded by impact fees." 53 P.S. § 10502–A.

In order to adopt a transportation capital improvements plan, a municipality must create an impact fee advisory committee to develop and prepare land use assumptions and a roadway sufficiency analysis, which inform the content of the plan. 53 P.S. § 10504–A. The plan must specify the road improvements within each transportation service area attributable to existing roadway deficiencies, forecasted pass-through traffic, and projected future development, including the anticipated costs of each. 53 P.S. § 10504–A(e)(1). A "pass-through trip" is defined as "a trip which has both an origin and a destination outside the [transportation] service area." 53 P.S. § 10502–A.

A municipality must assess impact fees for a new development project using a per-trip cost multiplier specific to the transportation service area in which the new development project is located. 53 P.S. § 10505–A(a)(2). The per-trip cost multiplier is calculated by dividing the anticipated total cost of road improvements attributable to projected future development within the transportation service area, which does not include the cost of road improvements attributable to existing roadway deficiencies and forecasted pass-through traffic, by the anticipated amount of peak-hour trips to be generated by all new development within the transportation service area. 53 P.S. §§ 10504–A(e)(1)(iv)(C), 10505–A(a)(1). The anticipated amount of peak-hour trips must be calculated in accordance with the edition of the Manual adopted by the municipality.[2] 53 P.S. § 10505–A(a)(1). The Handbook is not referenced in Act 209. (Board Opinion, F.F. ¶ 21, R.R. at 277.)

The specific impact fee for a new development project is calculated by multiplying the per-trip cost for the transportation service area by the "estimated number of peak-hour trips to be generated by the new development ... using generally accepted traffic engineering standards."[3] 53 P.S. § 10505–A(a)(2). In 2000, the General Assembly passed an amendment to Act 209, which, *inter alia*, amended Section 505–A(a)(2) to specify "peak-hour" trips, and added Section 505–A(h), which permits a municipality to impose an additional im-pact fee "upon new developments which generate 1,000 or more new peak-hour trips, net of pass-by trips" as defined by the Manual. Act of June 23, 2000, P.L. 495, No. 68 § 13; *see also* 53 P.S. §§ 10505–A(a)(2), (h).

■ The actions the General Assembly took in 2000 with respect to Section 505–A(a)(2) and 505–A(h) indicate its legislative intent. In the same amendment, the General Assembly amended Section 505–A(a)(2) to specify "peak hour" trips and added Section 505–A(h), which permits a municipality to impose an additional impact fee in cases where the amount of "new peak-hour trips, net of pass-by trips" exceeds a designated threshold. Crucially, Section 505–A(h) pertains to a municipality's limited ability to assess an *additional* transportation impact fee on a new development project, which the parties agree does not apply to Metro's proposed bank branch facility. Because the General Assembly added the more specific "new peak-hour trips, net of pass-by trips" language in Section 505–A(h) at the same time it specified only "peak-hour" trips in Section 505–A(a)(2), and because more specific language should not be implied where excluded, we conclude that the legislature perceived a difference between the terms, and intended to exclude pass-by trips only when evaluating whether a municipality can assess an additional transportation impact fee pursuant to Section 505–A(h).

2. Per–Trip Cost Multiplier =

Anticipated Total Cost of Road Improvements Attributable to Projected Future Development Within the Transportation Service Area (Not Including Cost Attributable to Pre–Existing Roadway Deficiencies and Forecasted Pass–Through Traffic)

÷

Anticipated Amount of Peak–Hour Trips to Be Generated by All New Development Within the Transportation Service Area (Calculated in Accordance with the Manual)

3. Specific Impact Fee =

Per–Trip Cost of the Transportation Service Area

×

Estimated Number of Peak–Hour Trips to Be Generated by the New Development Project (Derived Using Generally Accepted Traffic Engineering Standards)

This conclusion is further supported by Act 209's internal logic and the testimony of the Township's expert witness. To calculate the per-trip cost multiplier, Section 505–A(a)(1) requires that the anticipated total cost of road improvements attributable to projected future development within the transportation service area, less the cost of road improvements attributable to existing roadway deficiencies and forecasted pass-through traffic, be divided by the anticipated amount of peak-hour trips to be generated by all new development within the transportation service area, which must be calculated in accordance with the Manual. The Township's expert witness testified that he understood the Township to have used total peak-hour trips when it calculated the per-trip cost multiplier for Transportation Service Area "B." (H.T. at 69, R.R. at 90.) Additionally, the expert witness testified that the definition of new development could also refer to projects that generate additional vehicular traffic to the site of the new development project, not to the roadway in general. (H.T. at 87, 96, R.R. at 108, 117.)

Thus, in this case, to calculate the transportation impact fee for a specific new development project using only new peak-hour trips, net of pass-by trips, as Metro seeks, would promote an absurd result: the actual revenue generated by transportation impact fees for funding the costs of transportation capital improvements would fall short of the Township's anticipated total costs, thereby destroying a stated purpose of Act 209. Indeed, the Township's anticipated total cost already pre-deducts the cost attributable to forecasted pass-through traffic. Furthermore, practically speaking, the Township's method of calculating transportation impact fees ensures that first-coming developers to a transportation service area do not unfairly bear the cost of increases in vehicular traffic to the roadway, which will eventually level off. By requiring all developers to contribute in proportion to the traffic entering and exiting the driveways of their new development projects, the Township's method prevents such results. Therefore, because the exclusion of pass-by trips during the calculation of a transportation impact fee for the new development project, where pass-by trips were not excluded during the calculation of the per-trip cost multiplier, would produce a logically absurd result that is not supported by a readily discernible practical purpose, we conclude that the General Assembly did not intend that pass-by trips be excluded in this instance.

Section 505–A(a)(1) dictates that the divisor used to determine the per-trip cost multiplier be calculated in accordance with the Manual. Section 505–A(a)(2) dictates that the factor used to determine the transportation impact fee for a specific new development project, in conjunction with the per-trip cost multiplier, be derived using generally accepted traffic engineering standards. Metro argues that the language in Section 505–A(a)(2) is broader than the language of Section 505–A(a)(1) and that this difference requires an explanation. We agree. However, we find the following explanation for this difference in language correct: engineering judgment may be necessary in cases where the Manual, by virtue of its limitations as a written document, cannot accurately predict trip generation for a particular new development project. Furthermore, this explanation does not produce the absurd result that flows from Metro's position: that the revenue collected by the Township through transportation impact fees would fall short of the Township's total costs.

Moreover, the Township correctly argues that what constitutes a generally accepted traffic engineering standard is a factual determination. Both experts ac-

knowledged that reference to the Manual accords with generally accepted transportation engineering standards. (H.T. at 34–35, 67, R.R. 55–56, 88.) That reference to both the Manual and the Handbook also accords with those standards does not mean that reference to both is required. The evidence adduced before the Board was sufficient to support the reasonable conclusion that the difference in language between Sections 505–A(a)(1) and 505–A(a)(2) does not require that pass-by trips be excluded during the calculation of a transportation impact fee. Furthermore, we must accept the determinations of the Board, which heard the testimony, evaluated the credibility of the witnesses, and served as fact-finder in this case; we may not substitute our judgment for, and are bound by, its findings. *In re Nevling,* 907 A.2d 672, 674 (Pa.Cmwlth.2006).

We hold that the Board did not commit an error of law when it confirmed and approved the Township's calculation of the transportation impact fee because the Township's calculation comports with the rules of statutory construction and the substantial evidence adduced before the Board.

Accordingly, we affirm the decision of the Trial Court.

### ORDER

AND NOW, this 9th day of July, 2015, the Order of the Court of Common Pleas of Lancaster County in the above-captioned matter is AFFIRMED.